# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Antwann Green, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 12 C 50130 |
| | ) | |
| Wexford Health Sources, et al., | ) | |
| | ) | |
| *Defendants*. | ) | Judge Frederick J. Kapala |

## ORDER

Defendants' motion for summary judgment [309] is granted. Defendants' motion to bar plaintiff's expert [312] is denied as moot. This case is closed.

## STATEMENT

Antwann Green has sued two prison doctors, Dr. Imhotep Carter and Dr. Bessie Dominguez, alleging that they were deliberately indifferent to his serious medical needs while he was incarcerated at the Dixon Correctional Center ("Dixon").[1] In particular, Green alleges that Carter and Dominguez were deliberately indifferent by failing to diagnose and treat his hypothyroidism in a timely fashion and, specifically, failing to prescribe a soy-free diet despite his numerous requests. Defendants now move for summary judgment, arguing that no reasonable jury could conclude that they were deliberately indifferent to Green's serious medical condition and, even if arguably a jury could make such a finding, they are protected by qualified immunity. Defendants have also filed a <u>Daubert</u> motion seeking to strike Green's expert witness, a PhD chemist, who has testified that, in his opinion, it is "well established that the chemical properties of soy can interfere with thyroid function in people, and that consuming soy can negatively affect the efficacy of medication used to treat hypothyroidism." For the reasons which follow, the motion for summary judgment is granted and the motion to strike is denied as moot.

### I. BACKGROUND

#### A. Hypothyroidism

The thyroid gland is a butterfly shaped organ on the neck that has several functions, one of which includes controlling the body's metabolism. The thyroid produces several hormones, notably for this case thyroid stimulating hormone (TSH), triiodothyroxine (T3), and thyroxine (T4). Hypothyroidism is a condition where the thyroid gland is not producing those hormones properly,

---

[1]There were additional defendants in this suit at earlier junctures, but they have since been dismissed, leaving only Carter and Dominguez.

which can affect the body's metabolism. Common symptoms of hypothyroidism are goiter, fatigue, hyperpigmentation of the skin, brittle or thinning hair, brittle skin, unexplained weight gain, constipation, memory problems, muscle aches, and, at advanced stages, slowing of the reflexes of the muscles and nerves. Hypothyroidism varies in degree from borderline or subclinical cases to severe cases. Many individuals with mild hypothyroidism are asymptomatic and the condition may become better or worse with time.[2] A diagnosis of hypothyroidism is based on a combination of physical examination, subjective complaints, and the results of a blood test known as a thyroid function test ("TFT"), which measures the TSH, T3, and T4 levels in the blood. These levels can vary rapidly, so multiple tests may be necessary to determine the presence of hypothyroidism. To raise a concern that a patient has hypothyroidism, the TFT results typically have to indicate that two of the three values are abnormal. Treatment for low levels of hypothyroidism may include monitoring and periodic reevaluation, while more serious cases of hypothyroidism can be treated by synthetic hormones as a replacement for the hormones not produced by the thyroid. According to the record, that treatment is often lifelong but must be monitored in order to avoid tipping an individual into hyperthyroidism, which is caused by too much thyroid hormone being present.

### B. Green's Medical Care Prior to the Defendants' Care

During the relevant time period of this lawsuit, Green was incarcerated at Dixon as a consequence of a murder conviction. Green has never been diagnosed with a soy allergy and, prior to incarceration, was not diagnosed with hypothyroidism. After his incarceration, and since 1998, Green has received a vegan diet in accordance with the tenets of his religion. Green was transferred to Dixon in 2005, and began at that time to seek medical care from various medical caregivers (none of whom are at issue in this suit nor is their care) for a panoply of problems: shoulder pain, bone and muscle aches, numbness, fatigue, rapid heartbeat, brittle hair, constipation, dizzy spells, abdominal pain, loss of hair, shortness of breath, deformed fingernails, flatulence, and sleep disturbance. At the end of 2006, Green was given the first of several TFTs, which returned results showing him in the normal reference range for T3, T4, and TSH.[3] In July 2009, Green was again given a TFT, the

---

[2]Throughout the Local Rule 56.1 statements, both parties raise a number of objections, many of which do not warrant discussion beyond inclusion or non-inclusion of the fact at hand in the background above. Of greater import, however, are defendants' objections to this court considering the content of Green's grievances for the truth of the matter and for the party admissions (statements allegedly made by Dominguez and Carter) within them. However, Green has filed a declaration indicating, under oath, that the contents are true and would testify to the same if called to testify on the matter. That is all that is needed for the court to consider that information at the summary judgment stage. See Article II Gun Shop, Inc. v. Gonzales, 441 F.3d 492, 496 (7th Cir. 2006). Thus, that repeated objection is overruled. Defendants also object to this court's consideration of various print outs from internet-based medical resources (like the Mayo Clinic's website and John Hopkins website, etc.) offered by Green in an effort to show various medical facts, like symptoms and common treatments for hypothyroidism. Green does not claim the print outs meet the learned treatise exception to the hearsay rule, see Fed. R. Evid. 803(18), but instead cites to Rowe v. Gibson, 798 F.3d 622 (7th Cir. 2015), for the proposition that this court may consider those sources notwithstanding their hearsay nature. The court is not convinced that Rowe should be read so broadly as to permit this court to accept hearsay evidence without it meeting one of the exceptions to the hearsay rule, but ultimately does not rule on that issue, because even accepting those filings the court's conclusion is not altered.

[3]Green testified that sometime in 2007 he received a TFT in which he tested out of range for TSH, but there is no evidence in the record to support that testimony, Green is not a medical doctor nor does he have other medical training in order to permit him to make that diagnosis or interpret the results of a TFT himself, and any statement made

results of which show a slightly elevated TSH level above the reference range. The record that this court has, fragmented as it is, appears to lack the results for the T3 and T4 hormones for the July 2009 TFT. However, defendants represent, and Green does not dispute, that both T3 and T4 were in the normal range for that test.

In August 2009, Green was given another TFT. In that test, he again scored slightly out of range for TSH, but within the normal range for his T3 and T4 levels. The results were the same when he was tested again in December 2009. Although Green discusses in his depositions various medications given to him by providers during this pre-defendant-care period of time—including some treatment for Green's complaints of constipation—there are few specifics in Green's testimony and no medical records in the record provided to the court to illuminate what that treatment looked like. In January 2010, Green filed a medical grievance (there is no evidence that he had been seen by Carter prior to this grievance or that Carter was ever made aware of the grievance) in which he complained about untreated abdominal and lower back pain and indicated his belief that he had hypothyroidism. In that grievance, Green requested a soy-free vegan diet, mentioned a lawsuit filed in the Central District of Illinois against IDOC by prisoners claiming that soy-heavy diets ultimately caused or exacerbated their hypothyroidism (Harris v. Brown, 07 CV 3225 (C.D. Ill.)), and a colonoscopy. In February 2010, the grievance officer denied the grievance, stating that healthcare had indicated that there was nothing to suggest the diet was the problem and that he had come back negative for colon cancer. He was also told to follow up with health care if symptoms reoccurred.

### C. Green's Care from Carter

At the outset of his deposition, Carter testified that he did not recall Green or the care he provided at all, and was relying on the medical records and treatment notes for his testimony. Nevertheless, Carter was employed at Dixon as the medical director from January 4, 2010 to July 24, 2011 by Wexford Health Sources, Inc., the vendor which provides medical services at Dixon. Green first saw Carter on February 25, 2010 based on complaints of a metal taste in his mouth, constipation, and abdominal pain. Carter noted, after a physical examination, that Green's abdomen was soft, demonstrated positive bowel sounds, was non-tender, and did not demonstrate rebounding or masses. Based on Green's complaints of constipation and abdominal pain, Carter ordered plaintiff to undergo a stool guaiac test and scheduled a collegial review (where Wexford physicians and staff discuss the patient's medical condition and care necessary to address the condition and which is also necessary to schedule off-site procedures) to obtain a right upper-quadrant abdominal ultrasound for Green. On March 5, 2010, Carter discussed Green's condition at the collegial review

---

to him by a medical professional (who, in 2007, could not have been either defendant) would be hearsay and Green has not pointed to any exception to the hearsay rule which would make it admissible. See Fed. R. Evid. 802. The most obvious exception, Rule 803(4)'s exception for statements made for medical diagnosis or treatment, does not apply. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 564 (7th Cir. 1996) ("The Rule excepts statements made by a person seeking medical attention to the person providing that attention. Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient."); see also Martin v. Nicklow, 499 F. App'x 569, 573 (7th Cir. 2013) ("The district court mistakenly believed that the note in the medical record was made 'for purposes of medical diagnosis or treatment' and so qualified as excepted hearsay under Federal Rule of Evidence 803(4). That exception applies only to statements made by the patient."). Moreover, there is nothing in the record to suggest that any such medical personnel was functioning as an agent of either Carter or Dominguez when he or she made this theoretical statement. See Fed. R. Evid. 801(d)(2).

3

and noted that the stool guaiac test had returned negative. The collegial review denied Carter's request for an ultrasound and, instead, decided to monitor Green's condition on site and recommend him for collegial review in the future if needed.

Sometime in early 2010, Green received literature concerning hypothyroidism and informed Carter that he believed he had hypothyroidism. Green's testimony is unclear as to when that occurred and the first time hypothyroidism is mentioned in his medical records is in June 2010, see infra, when Carter ordered another series of TFTs.

Regardless, on April 1, 2010, Carter again saw Green for complaints of abdominal pains and trouble with bowel movements. A physical examination again showed Green's abdomen to be normal and Carter informed Green that he was likely constipated. Carter ordered Green to undergo a number of laboratory tests to investigate Green's condition, including a KUB (kidney, uterus, and bladder) x-ray of his abdomen, a comprehensive metabolic panel, and a urinalysis test. Carter also prescribed Green fiber tablets in an effort to relieve his constipation. On April 6, 2010, Green underwent the KUB abdominal x-ray, which showed only that Green had mild constipation.

On May 10, 2010, despite the fiber tablets, Carter saw Green for complaints of abdominal pains and constipation. Carter performed a physical exam, which was normal, and discontinued the apparently ineffective fiber tablets. Instead, he prescribed Lactulose and Colace laxatives in an attempt to alleviate Green's constipation. On May 30, 2010, Green filed a grievance concerning his medical care, although again there is no evidence in the record that Carter was made aware of that grievance. In it, Green claims that he had been complaining for three years of intestinal problems, pain in his stomach and groin region, "brain fog," fatigue, irregular or rapid heart beats, painful fingernails, spots on his skin, a bulge in the lower right section of his stomach, and constipation lasting as long as five days. Green also complained that Carter had prescribed him the same medication as previous prison doctors, notwithstanding the fact that he informed Carter that those medications did not alleviate his symptoms. Finally, Green diagnosed his problem as hypothyroidism. Thus, he demanded treatment for hypothyroidism, to be treated for an intestinal blockage, and to receive a soy-free vegan diet, which he claimed was a cause of his hypothyroidism.

On June 4, 2010, Carter saw and examined Green to further evaluate his abdominal pains. At that time, Green stated that he wanted to join the Harris lawsuit based on the soy in his diet. On review of Green's medical history, Carter noted that Green had been on three different stool medications, but was now complaining that his stools "look[ed] funny." Carter performed a physical examination of Green's abdomen, which was normal. Carter assessed that Green had developed a psychosomatic gastrointestinal illness. Nevertheless, Carter ordered Green to undergo another round of TFTs. Green also reported at that visit that he had a family history of colon cancer, was concerned that he might have colon cancer, and requested testing to rule out colon cancer. Carter ordered Green to undergo carcinoembryonic antigen (CEA) tests to investigate Green's concerns about colon cancer.

That same day, Green filed another grievance concerning Carter's care (again, though, no evidence in the record suggests Carter saw that grievance). In the grievance, he stated that Carter called him an "ambulance chaser," told him that there is no proof that soy causes thyroid problems, and otherwise acted unprofessionally towards Green. Because of that, Green requested that Carter be disciplined, that Green be cared for by a different doctor, and that Green receive a CEA test and

4

a TFT (apparently notwithstanding the fact that Carter had already ordered those tests).

Green underwent the TFTs on June 8, 2010 and June 22, 2010, both of which returned normal and within laboratory reference ranges for all three hormones. The CEA test was also negative. On June 15, 2010, the grievance officer denied Green's May 30, 2010 and June 4, 2010 grievances because the first thyroid test did not suggest hypothyroidism and recommended that Green drink more water to ease his constipation.

Carter saw Green next on July 14, 2010, this time complaining of pain in his side. On that date, Carter followed up on his prior request to obtain an abdominal ultrasound for Green. Carter wanted to obtain an ultrasound of Green's gallbladder to further investigate Green's reported abdominal pain, bloating, and weight loss. Carter appealed the denial of his previous request via a collegial review to obtain an abdominal ultrasound for Green. Based on his appeal, Wexford approved the gallbladder ultrasound for Green, which he underwent on September 1, 2010. The abdominal ultrasound was normal.

On September 22, 2010, Carter saw Green due to complaints of constipation and bloating. Carter explained the ultrasound results to Green, performed a physical examination of Green's abdomen (which was normal), came to the conclusion that Green suffered from chronic constipation, and adjusted Green's medication. In particular, Carter discontinued Green's fiber tablets (it is not clear on the record when Green began a regimen of fiber tablets again after Carter's previous discontinuation of that treatment) and Colace prescription, while increasing Green's Lactulose prescription. On October 6, 2010, Carter again saw Green for complaints of constipation and also a complaint of a lump in the lower left side of Green's rib cage. Carter examined Green's abdomen and found it normal, noted Green's continued weight gain and healthy appearance, and again concluded that Green suffered from chronic constipation. Moreover, according to the medical records, Green informed Carter that his bowels were moving better with the Lactulose syrup, and Carter did not change Green's treatment.

That same day, Green grieved Carter's care. In that grievance, Green claims that he told Carter that the medication was not working, that he was still experiencing constipation, and that he was now experiencing a lump under his rib cage. Green also wrote that he requested a colonoscopy, but that Carter told him there was no need for a biopsy, except "maybe a mental biopsy." Additionally, Carter told Green that he was just going to have to live with the pain. According to Green, Carter continued to prescribe the same medication notwithstanding its previous ineffectiveness.

According to the medical records, on November 30, 2010, Green saw Carter for complaints of abdominal pains, constipation, and that the Lactulose was no longer working. Carter noted that a physical exam of Green's abdomen was normal, but also noted Green's previous family history of colon cancer. Carter concluded that Green continued to suffer from chronic constipation notwithstanding the maximum permissible dose of Lactulose. As such, Carter requested a collegial review of Green's case in order to obtain outside consultation at University of Illinois Chicago's (UIC) gastrointestinal clinic.

On December 3, 2010, Carter completed a medical special services referral and report in order to obtain an outside consultation for Green at the UIC gastrointestinal clinic. On December

7, 2010, Carter discussed Green's case in a collegial review with another Wexford physician. At that time, that physician and Carter approved Green for an outside gastrointestinal consultation at UIC. On December 8, 2010, Wexford issued final approval of Carter's request for Green to undergo an outside gastrointestinal evaluation at UIC. On March 9, 2011, Green was examined by Dr. Muhammad Nauman Jhandier at UIC. Green reported to Dr. Jhandier that he had not moved his bowels in five-to-six days. Dr. Jhandier planned to perform a colonoscopy on Green. Dr. Jhandier also ordered fiber and Miralax for Green.

On March 11, 2011, Carter saw Green during a medical writ follow-up for his visit to UIC. At that time, Carter reviewed Dr. Jhandier's report and recommendations and noted that Dr. Jhandier recommended a stool regimen for Green and a colonoscopy. However, Green was already on a stool regimen as recommended by Dr. Jhandier. Carter examined Green's abdomen at that time, which was normal (i.e. soft, non-tender, and demonstrated positive bowel sounds). Based on Dr. Jhandier's recommendation and Green's medical history, Carter planned a collegial review for Green to obtain a colonoscopy. After Carter presented his request, Green was approved for a colonoscopy on March 15, 2011. On that same day, Carter saw Green and informed him of the results of his most recent laboratory tests (all of which were normal) and that he had been approved for the colonoscopy.

On March 25, 2011, Green underwent the colonoscopy at UIC. The doctor performing the procedure determined that Green's rectum, sigmoid colon, ascending colon, cecum and ileocecal valve were normal. Four polyps, each three to five millimeters, were found in Green's descending and traverse colon, which were removed during the colonoscopy. Green was thereafter discharged from UIC and ordered to return for a follow-up visit (the record is unclear whether this follow-up visit at UIC occurred).

On March 30, 2011, Carter saw Green during a medical writ follow-up after his colonoscopy at UIC. At that time, Carter reviewed the results of Green's colonoscopy results and recommendations, and noted that there was no identified reason for Green's bowel abnormalities. Carter examined Green at that time and noted that he appeared healthy. Carter also examined Green's abdomen, and noted that it was soft, non-tender, and demonstrated positive bowel sounds. Carter's assessment for Green was chronic constipation and that he recently had colon polyps removed. As such, Carter continued Green's current management plan, including his laxatives. Carter ordered Green to be re-evaluated in thirty days in order to evaluate the effectiveness of Green's bowel regimen. Green did not follow-up in thirty days with Carter, indeed Green never returned, or sought to return, to Carter after the March 30, 2011 visit. Carter ceased working at Dixon in July 2011. It is undisputed that, during the same period Carter was treating Green for constipation, he also treated him for hypertension, treatment about which Green does not complain.

### D. Green's Care From Dominguez

It is unclear from the record when Dominguez first provided care to Green, but his complaint focuses on the time after he ceased receiving care from Carter. On February 9, 2011, Dominguez saw Green for complaints of fatigue and joint pain. At that appointment, Dominguez reviewed at least the most recent of Green's TFT results (which came back normal for all three hormones). She ordered additional tests to determine the source and severity of Green's joint pain, including an erthrocyte sedimentation rate (ESR) test, which is used to determine the amount of inflammation in a patient's body, and a antinuclear antibodies (ANA) test, which is used to investigate whether a

patient has an autoimmune disorder. Dominguez also prescribed anti-inflammatory medication, including Naprosyn, and instructed Green, who is according to the record a body builder with "six pack abs,"[4] to be gentler in his exercise routines. She counseled Green that excessive exercise can cause damage to cartilage and ruin the body's joints. In her deposition, Dominguez admitted that she did not review all of Green's medical records, and that if she had seen Green's 2009 TFT results, she would have ordered a TFT test for Green on February 9, 2011.

On July 14, 2011, Dominguez saw Green for his complaints of chronic constipation, muscle aches, and his request for Metamucil. Dominguez's assessment of Green's condition at that time included chronic constipation, body/muscles aches and pain (mild arthritis), and thoracic and lumbar muscle pain. Dominguez ordered Metamucil, a fiber supplement, for Green to try and alleviate his constipation. Dominguez also ordered Green to try walking exercises to alleviate his constipation. Finally, Dominguez ordered Naprosyn for Green to treat his muscle aches and pains.

On May 8, 2012, Dominguez saw Green for a complaint of gastrointestinal discomfort in the right-upper quadrant of his abdomen, as well as a complaint that he was always tired. Green also stated at that time that his bowel movements were generally alright. Dominguez examined Green at that time and determined that he had right-upper quadrant abdominal pain, but no hepatomegaly nor back or costal vertebral tenderness. Green also stated that he had been eating his meals with no problems, that he did not have nausea or vomiting, did not report weight loss, and he had good bowel sounds on exam. Dominguez then reviewed at least some of Green's medical records, including his x-rays, UIC consultation records, and his colonoscopy test results, and noted that there was no definitive reason found for Green's gastrointestinal complaints. Nevertheless, Dominguez ordered various laboratory tests, including a complete blood count and a comprehensive metabolic panel and instructed Green to return for further evaluation after those tests.

On May 21, 2012, Dominguez saw Green for that follow-up examination to review and discuss his laboratory results. At that time, Dominguez examined Green, who stated that he had abdominal pain in the right-upper quadrant of his abdomen and that his prior thyroid tests could demonstrate a cause of his fatigue. Dominguez performed a physical exam, which showed Green's abdomen was soft, without right upper quadrant tenderness, and demonstrated good bowel sounds. Dominguez also reviewed Green's most recent laboratory results—a complete metabolic panel, a complete blood count, and a urinalysis—which were all normal. Given Green's statement concerning his thyroid, Dominguez noted in her chart that Green may have a thyroid problem and ordered him to undergo another TFT and to return in two weeks for a follow up on his TFT results. The result of that TFT, given on May 23, 2012, showed that Green's TSH was, like his 2009 exams and unlike his 2010 exams, slightly elevated, but that his T3 and T4 levels were within normal range. At some point, although the record is not clear on when, Green allegedly told Dominguez about his concerns about his thyroid and soy's effect thereon, and Dominguez responded "Don't even try it, we've been through this already."

On June 4, 2012, Dominguez saw Green for his follow-up examination. Dominguez

---

[4]The undisputed fact that Green has a body builder's physique and "six pack abs" is difficult to square with his testimony concerning his chronic fatigue. Nevertheless, since this case is currently at summary judgment, the court will accept both as true.

7

reviewed Green's TFT results and noted that Green's TSH levels were elevated, though his T3 and T4 levels were still within normal ranges. However, Dominguez was concerned that Green was abnormally sensitive to fluctuations in his TSH levels because of his chronic problems and other symptoms consistent with hypothyroidism. As such, Dominguez diagnosed Green with mild hypothyroidism and prescribed Synthroid for him, which is used to regulate the body's TSH levels. Dominguez ordered Green not take the Synthroid within thirty minutes of eating. Dominguez further ordered Green to undergo a repeat TFT in one month to determine whether the Synthroid was working. The parties agree that Green was never at risk of harm by receiving Synthroid, since it was a low dose and his TSH levels were being monitored. The next TFT occurred on July 3, 2012, which showed a decrease in TSH from the previous test, and all three hormones were reported as being in normal range.

On July 12, 2012, Dominguez saw Green for a follow up on the July 3, 2012 TFT. Dominguez advised Green that the results were normal and that his TSH levels were within range. Green testified that, following treatment with Synthroid, his condition improved. At that time, Green requested Metamucil for his constipation, which Dominguez ordered as a daily treatment along with Green's Synthroid. On November 16, 2012, Dominguez saw Green for a routine physical, where she noted his hypothyroidism and continued his Metamucil and Synthroid medications. On November 27, 2012, Green received a follow-up TFT, which returned all three hormone levels as normal. In December 2012, Dominguez saw Green at the general medical clinic and noted his controlled hypothyroidism and reviewed his most recent TFT results. Dominguez ordered Green to continue taking his Synthroid. Green testified that, after receiving his prescription for Synthroid and voluntarily avoiding the soy-based products in his food by spending a significant amount of money at the prison commissary to supplement his diet, he has seen an improvement in his condition, however his symptoms have periodically continued.

### E. Procedural Background

In April 2012, Green filed the instant suit claiming deliberate indifference to a serious medical need. Specifically, he alleges that Carter and Dominguez were deliberately indifferent for failing to diagnose and treat his hypothyroidism and for failing to prescribe him a soy-free diet. Carter and Dominguez, based on the above-stated record, have moved for summary judgment, arguing (1) there is insufficient evidence for a reasonable jury to conclude they were deliberately indifferent to a serious medical need and (2) even if there were, they are entitled to qualified immunity. Defendants have also moved to bar Green's expert witness in a separate motion. Because the court ultimately concludes that defendants are entitled to summary judgment even assuming the admissibility of the expert's testimony, the court need not address the motion to bar and it is denied as moot.

### II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating such a motion, the court's role is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Preddie v. Bartholomew Consol. Sch. Corp., 799 F.3d 806, 818-19 (7th Cir. 2015). The court must draw all reasonable inferences in the light most favorable to the party opposing the motion. See id. at 812-13. "If a

party moving for summary judgment has properly supported his motion, the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial." Cincinnati Life Ins. Co. v. Beyrer, 722 F.3d 939, 951 (7th Cir. 2013) (emphasis and quotation marks omitted).

"[D]eliberate indifference to [the] serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" such that a prisoner may bring a cause of action against a prison official. Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (quotation marks omitted). The Seventh Circuit has distilled the language from Estelle into a two-part test, requiring a prisoner to establish (1) an objective component, a serious medical condition,[5] and (2) a subjective component, an official's deliberate indifference to that condition, to make out a claim for deliberate indifference under § 1983. See Gomez v. Randle, 680 F.3d 859, 865 (7th Cir. 2012). To satisfy the subjective element of a deliberate indifference claim against a medical provider, a plaintiff must prove that "[t]he official [had] subjective knowledge of the risk to the inmate's health, and the official . . . disregard[ed] that risk." Gayton v. McCoy, 593 F.3d 610, 620 (7th Cir. 2010). To survive summary judgment, plaintiff must have evidence sufficient to create a genuine issue of material fact that defendants' medical decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." King v. Kramer, 680 F.3d 1013, 1018-19 (7th Cir. 2012) (quotation marks omitted). However, "[i]n evaluating the evidence," this court "must remain sensitive to the line between malpractice and treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment." Id. at 1019. Indeed, even gross negligence is insufficient to meet the necessary standard. See id. at 1018. Nevertheless, plaintiff is not required to show "intentional harm" or "that he was literally ignored." Id. at 1018-19 (quotation marks omitted).

## A. Carter

Carter first argues that no reasonable jury could conclude that he subjectively inflicted cruel and unusual punishment through deliberate indifference to Green's serious medical needs. Green argues, in response, that the following acts could be relied upon by a reasonable jury to find that Carter was subjectively indifferent: (1) the delay in diagnosing and treating Green's hypothyroidism despite his symptoms remaining unchanged throughout his treatment, (2) Carter prescribed the same medications as had been previously prescribed and proven ineffective, (3) Carter called Green an "ambulance chaser" and diagnosed him with a psychosomatic disorder, and (4) Carter refused to prescribe a soy-free diet despite the fact that Green's expert has testified that it is "well established that the chemical properties of soy can interfere with thyroid function in people, and that consuming soy can negatively affect the efficacy of medication used to treat hypothyroidism" and Green showed Carter some literature to the same effect during his treatment.[6]

---

[5]Defendants make an argument concerning the objective component of the deliberate indifference test, however, because the court finds defendants' arguments concerning the subjective component and qualified immunity persuasive, it need not address that argument.

[6]Green's arguments against both Carter and Dominguez are difficult to discern, as he combines the actions of each defendant and argues as though all of the acts were committed by the same individual. However, he provides no authority, and the court has found none, for imputing the acts of Carter to Dominguez or vice versa, and thus the court

9

As to the first, the record does not bear out the existence of any delay in treatment, but, rather, a delay in correctly diagnosing Green. But there is not even sufficient evidence on the record to support a finding of negligence in Carter's failing to diagnose Green with hypothyroidism, much less deliberate indifference. In the thirteen months Carter cared for Green, he saw Green eleven times for various complaints of abdominal pain or constipation. At all eleven of those appointments, Carter performed a physical examination of Green's abdomen. Additionally, he sought two ultrasounds (ultimately only getting approval for one), a KUB x-ray, a comprehensive metabolic panel, a urinalysis test, two TFTs (and reviewed several others), a CEA test, a consult from a specialist at UIC, and a colonoscopy. Green suspected that he had a thyroid problem, but an inmate is not permitted to dictate the course of his treatment or diagnosis and Carter is not required to replace his medical judgment with that of his patient's. See Forbes v. Edgar, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [plaintiff] is not entitled to demand specific care. [He] is not entitled to the best care possible. [He] is entitled to reasonable measures to meet a substantial risk of serious harm to [him]. The defendants have taken those measures."). That Green may have been right[7] about his thyroid condition does not alter the analysis: he presented with some symptoms consistent with hypothyroidism (constipation, weight fluctuation, etc.), but also lacked several of the most common (like goiter). Indeed, when Carter tested Green for hypothyroidism by the way of two TFTs, both came back within normal range for all three hormones. Green argues that it may have been better practice to space those two TFTs out further based on Carter's testimony, or that Carter should have performed more TFTs based on Green's 2009 TFTs which showed a somewhat elevated TSH, but he is not entitled to demand the best care and Green points to nothing on the record to show that Carter's decision to seek out other diagnostic testing after the two normal TFTs is so far afield from normal medical practice that no competent doctor would have followed the same path. See Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014) ("Making that showing is not easy: A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." (quotation marks omitted)).

For similar reasons, Green's argument that a jury could conclude Carter was deliberately indifferent for failing to start Green on Synthroid earlier fails. Synthroid is designed to treat hypothyroidism, and Carter had very good reasons (even if potentially incorrect ones) to conclude that Green did not have hypothyroidism. Moreover, in the materials offered by Green from Synthroid's manufacturer, it specifically indicates that Synthroid is contraindicated for patients with abnormal TSH, but normal T3 and T4 levels, which is the only way Green has <u>ever</u> tested except in 2006 and again in 2010 when he tested in the normal range for all three hormones. Although the Synthroid ultimately provided Green relief from some of his symptoms and helped bring his TSH level back to normal, Carter can hardly be faulted for failing to give Green a medicine which the manufacturer indicates is contraindicated for Green (even ignoring the fact that Green tested in range in the 2006 and both of the 2010 TFTs).

---

will analyze each defendant separately to determine if either can be held liable for deliberate indifference.

[7]The fact that Green's symptoms have subsided, but not fully abated, does not necessarily suggest his problem is something other than hypothyroidism. According to the record, an individual under treatment for hypothyroidism can continue to exhibit symptoms even while undergoing treatment.

Green next argues that a jury could conclude Carter was deliberately indifferent by prescribing the same care other doctors in the past had (specifically, fiber tablets and laxatives), which had been ineffective at treating his conditions previously. Indeed, a physician who continues the same treatment plan repeatedly despite having been told that the plan was ineffective runs the risk of being liable for deliberate indifference. See Berry v. Peterman, 604 F.3d 435, 441 (7th Cir. 2010). However, there is no support in the record for Green's statement that Carter followed the same treatment plan as previous doctors. Although Green stated in his grievances that he had been given the same medications before and had told Carter as much, there is no indication that the medications had been given in the same dosages, on the same intake schedule, or in the same combination to treat Green's ailments. Indeed, the record, as set out above, shows that Carter consistently modified Green's medications throughout the relatively short time he treated Green in an effort to find some combination that worked (for example, Carter started off with fiber tablets, then changed from those to Lactulose and Colace once Green complained the fiber was not working, and then increased the Lactulose prescription and canceled the Colace when Green again complained) while also running diagnostic tests to attempt to discover if there was an underlying problem causing Green's abdominal discomfort and constipation. In short, no rational jury could rely on this argument, as supported by the record currently before the court, to determine that Carter was deliberately indifferent.

Next, Green argues that a jury could rely on the fact that Carter called Green an "ambulance chaser" and diagnosed him with a psychosomatic disorder (which Green equates to accusing him of faking) to find that he was deliberately indifferent. However, the fact that a prison physician suspects or even accuses an inmate of lying or exaggerating about his symptoms is not evidence of deliberate indifference where, as here, the medical provider continues to treat the inmate. See Coleman v. Ghosh, 609 F. App'x 871, 872-73 (7th Cir. 2015). This stands in contrast to cases like Walker v. Benjamin, 293 F.3d 1030, 1040 (7th Cir. 2002), where the Seventh Circuit held that a good-faith belief that an inmate is lying about or exaggerating his pain is not a sufficient defense against a claim of deliberate indifference at the summary judgment stage[8] where medical staff withheld prescribed pain medication because, here, Carter did not cease Green's treatment, indeed Carter ordered additional diagnostic testing. This case is controlled by Ray v. Wexford Health Sources, Inc., where the plaintiff, Ray, asserted that his doctor, Shah, was deliberately indifferent where Shah failed to order an MRI to discover the basis of Ray's shoulder pain, instead he diagnosed him with arthritis and treated accordingly. 706 F.3d 864, 866 (7th Cir. 2013). In that case, the Seventh Circuit held that an alleged statement from Shah, that he "didn't care how much pain [plaintiff] was in or how bad [his] shoulder hurt, he wasn't sending [plaintiff] for an MRI . . . so [plaintiff] was going to have to live with it," was, although potentially callous, not sufficient to show deliberate indifference in light of the history of arthritis treatment. Id. Similarly, here, even if Carter made a callous statement about how he did not believe Green or that Green was an "ambulance chaser" (or needed a "mental biopsy," although Green does not explicitly rely on this testimony in his argument), he nevertheless provided treatment for Green's complained-of symptoms in the form of various constipation medications, which he altered as previous attempts proved

---

[8]The Court left open that a good-faith belief an inmate is lying could be a defense presented to a jury even in circumstances where treatment was denied. Walker, 293 F.3d at 1040.

ineffective, and sought diagnostic testing by way of a host of different tests. See id. ("Ray calls this statement callous, and perhaps it was . . . [but] [t]he fact remains that, far from ignoring Ray's pain, Shah treated him for arthritis.").

That leaves only Green's argument that Carter was deliberately indifferent for refusing to prescribe a soy-free diet. As support for his argument, he relies on the report from his expert chemist, who testified in pertinent part that it is "well established that the chemical properties of soy can interfere with thyroid function in people, and that consuming soy can negatively affect the efficacy of medication used to treat hypothyroidism." The expert's testimony, however, only establishes an effect on the thyroid gland from soy, it does not establish the magnitude of the effect or whether whatever that magnitude is has permeated the medical community sufficiently that failure to prescribe a soy-free diet is something no minimally competent doctor would decline to do. Indeed, the record belies any contention that this scientific research has made the leap to medical treatment protocols. None of the various medical documents offered by Green in support of his case state that a soy-free diet is a required treatment protocol with those with slightly out-of-the-normal-range-TSH values.[9] Also, it is undisputed that the FDA has labeled soy beans generally recognized as safe for consumption in any quantity and even permitted labeling that soy protein is a good choice for cardiovascular health. See 21 C.F.R. § 101.82. Indeed, Green's own expert testified in his deposition that the research concerning soy's effect on the thyroid is still a "murky area" with "eminent scientists, some who say [soy] is a problem and some who say [soy] is not. . . . And so there is a range of scientific opinion." (Fitzpatrick Dep. 89.) And although he ultimately testified that he believed, based on his research, that soy does have an impact on the functioning of the thyroid gland, he admitted that "the jury is [still] out" on the question and that the research in the area is "unsettled." (Id. at 90-91.) In light of that record, the court discerns insufficient evidence to support a jury conclusion that every minimally competent doctor would have prescribed a soy-free diet based on slightly elevated TSH levels and that failure to do so constitutes deliberate indifference to a serious medical need. Holloway v. Del. Cnty. Sheriff, 700 F.3d 1063, 1073 (7th Cir. 2012) ("[A] prisoner is not entitled to receive unqualified access to healthcare. Instead, prisoners are entitled only to adequate medical care. There is not one proper way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." (citations and quotation marks omitted)).

---

[9]The Mayo Clinic Family Health Book excerpt only notes that an individual who is on an artificial thyroid hormone treatment should talk to their doctor if they eat "large amounts of soy products," but does not even then indicate that part of every competent treatment protocol must be removing that soy ingestion. And, of course, when treating with Carter, Green was not on that medication for soy to potentially interfere with, in any event. Similarly, the MayoClinic.com printout offered by Green only, again, notes that an individual who ingests large amounts of soy who is on artificial thyroid hormones should consult with their doctor. Neither the John Hopkins printouts nor the EndocrineWeb printouts mention soy at all as a factor in hypothyroidism diagnosis or treatment. Only the About.com printout specifically mentions soy "overconsumption" as a factor in developing a thyroid problem, and even then fails to define what "overconsumption" means. Nevertheless, Green's offerings certainly do not establish that a soy-free diet is a required treatment protocol for anyone with a history of mildly elevated TSH levels.

Moreover, Carter is entitled to qualified immunity on this issue.[10] Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Volkman v. Ryker, 736 F.3d 1084, 1089 (7th Cir. 2013) (quotation marks omitted). "The qualified immunity analysis therefore traditionally involves a two-part inquiry." Id. at 1090. "The first question is whether the defendants' conduct violated a constitutional right." Id. "The second question is whether that particular constitutional right was clearly established at the time of the alleged violation." Id. (quotation marks omitted). The burden to make that showing rests with Green, and he must "show that the contours of the right he alleges was violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. (quotation marks omitted). "[F]or qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel the conclusion for every like-situated, reasonable government agent that what he is doing violates federal law in the circumstances." Id. (alterations and quotation marks omitted). In other words, courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix v. Luna, 577 U.S. ___, 136 S. Ct. 305, 308 (2015) (quotation marks omitted). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." Id. (quotation marks omitted). Here, Green points to no case or cases which would have put Carter on notice that his treatment—including ordering a battery of diagnostic tests and providing medication, albeit ultimately ineffective medication, targeted at Green's complaints—violated the Eighth Amendment's prohibition on cruel and unusual punishment. Instead, he defines the issue broadly and states that the deliberate indifference standard is well established, and while that may be so, the Seventh Circuit has repeatedly criticized attempts to define the right which must be clearly established in such broad terms. See Volkman, 736 F.3d at 1090 ("[T]he Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality and the Seventh Circuit has long held that the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.") (alteration, citation, and quotation marks omitted)). There is no suggestion in the case law cited by Green, or found in this court's own research, that a prison doctor presented with a patient complaining principally of abdominal pain and constipation—and who has an occasional history of mildly elevated TSH levels—violates the Constitution by failing to order more TFTs or by failing to prescribe Synthroid and a soy-free diet.

Based on the foregoing, there is insufficient evidence on the record for a reasonable jury to conclude that Carter was deliberately indifferent to Green's hypothyroidism, and none of Green's arguments to the contrary, individually or as a group, change that analysis. Even if there were, Carter is entitled to qualified immunity. Accordingly, the motion for summary judgment is granted as to Carter.

---

[10] Green does not argue that Carter or Dominguez are not entitled to assert qualified immunity based on his employment by Wexford rather than IDOC. See Filarsky v. Delia, 566 U.S. ___, 132 S. Ct. 1657, 1665 (2012) (holding that qualified immunity typically extends to all employees of a state government, including those hired on a part-time or contractual basis).

13

## B. Dominguez

Green's arguments concerning Dominguez's care are similar to those made against Carter, specifically he argues that a reasonable jury could conclude she was deliberately indifferent due to (1) the delay in diagnosing and treating Green for hypothyroidism, particularly in light of his history of symptoms and her admitted failure to review all of Green's medical records; (2) her prescribing the same medications as previous doctors had attempted despite being told that they did not work; (3) her refusal to prescribe a soy-free diet, even after placing Green on Synthroid which is known to be affected by a soy-heavy diet; and (4) her telling Green, at some point in her treatment when he raised soy and thyroid concerns, "Don't even try it, we've been through this already."

As to the first, Dominguez initially saw Green, at least for the relevant purposes of this lawsuit, on February 9, 2011 for complaints of joint pain (Green does not argue that the treatment provided for those complaints was deliberately indifferent or even inadequate). Dominguez reviewed some of his medical records, but admitted in her deposition that she did not know that Green had two binders of medical records and thus may have missed whatever was in the other binder. Based on her testimony, a reasonable jury could conclude that she did not review the 2009 TFTs, which showed slightly elevated TSH levels, as she testified that had she seen those TFTs she would have ordered a TFT for Green at that time. But that admission, which is the basis for the majority of Green's argument as to this first point, does not move the ball towards deliberate indifference. Green did not present in February with complaints tied to his hypothyroidism, but with complaints of arthritis pain. So the fact that Dominguez did not sua sponte realize that Green may have some undiagnosed thyroid problems, about which he was not complaining, can hardly be considered deliberate indifference when she treated him fully for the issues about which he appeared before her. He did not see Dominguez for constipation until July 2011, at which time he requested Metamucil. She gave him that fiber supplement, ordered him to attempt walking exercise to relieve his constipation, and provided him with pain medication. After that, Green did not return with constipation or abdominal complaints until nearly a year later, in May 2012. Certainly she had no reason to assume that treatment was ineffective where Green did not return to see her for those issues for nearly a year. In May 2012, when he did return, she ordered two sets of tests, including eventually the two TFTs which led her to conclude, in June 2012, that he had mild hypothyroidism and prescribe Synthroid. At most, her failure to review his full medical records and diagnose, or at least test Green for, hypothyroidism in July 2011 was negligence, there is nothing in the record which would permit a jury to conclude deliberate indifference in the treatment history before the court. See King, 680 F.3d at 1018 (not even gross negligence is sufficient to show deliberate indifference).

Next, Green faults Dominguez for prescribing fiber supplements, despite the fact that the treatment had been ineffective before. However, the undisputed record discloses that when Dominguez prescribed that treatment for Green, he requested that treatment. Moreover, it was prescribed in combination with walking exercises in an attempt to alleviate Green's constipation, which there is no record of having been tried previously. And, again, he did not return with similar complaints for nearly a year after that treatment regimen had been put in place, from which Dominguez could conclude the regimen was working. Nevertheless, prescribing a constipation treatment requested by a patient is not evidence of deliberate indifference.

14

Green's third argument centers around Dominguez's refusal to prescribe a soy-free diet.[11] To the extent Green is arguing that Dominguez's refusal before she diagnosed Green with hypothyroidism and started him on Synthroid is evidence of deliberate indifference, it fails for the same reasons as it does against Carter supra. There is more to the argument against Dominguez, though, as the record discloses that Synthroid's manufacturer has cautioned that "Soybean flour (infant formula) . . . may bind and decrease the absorption of [Synthroid] from the GI tract."[12] First, the record does not disclose how much soy flour specifically Green would have been eating and the manufacturer's warnings appear geared towards infant formula in particular, and there is no suggestion in the record concerning how much infant formula he may have consumed. Second, Dominguez testified that she instructed Green to take Synthroid well before eating, as absorption of the drug is improved on an empty stomach (another point made by the manufacturer), so that the drug may have passed the GI tract before any soy flour could have entered his system. Third, and most critically, there is nothing in this case to suggest that Green's consumption of soy interfered with his absorption of Synthroid. The Synthroid was sufficiently absorbed, irregardless of Green's diet, to bring his TSH levels into the normal range. Green eventually ceased eating soy of his own volition, but there is no indication in the record that he began that practice prior to the Synthroid getting his TSH levels under control. Thus, a reasonable jury could not conclude that Dominguez's refusal to provide Green a soy-free diet was even negligent, much less so far afield from basic competent medical services as to be deliberately indifferent. See Pyles, 771 F.3d at 409.

That leaves only Green's argument that Dominguez's statement "Don't even try it, we've been through this already" when Green raised his concerns about his thyroid and soy diet is evidence of deliberate indifference. It is unclear from the record when Dominguez is supposed to have made this statement (she denies ever saying it, but the court is bound at this point to accept that she did), but it ultimately does not matter for the same reasons that the callous and dismissive statements purportedly made by Carter are not evidence of deliberate indifference where, as here, Dominguez continued to treat and seek diagnostic testing for Green throughout the complained-of period. See Ray, 706 F.3d at 866. Green, as an inmate of the state, has a right to constitutionally adequate medical care, which on this record he received, but no court Green has cited has extended a right to courteous medical care without the physician running afoul of the Eighth Amendment's prohibitions on cruel and unusual punishment. See id.

Finally, Dominguez is entitled to qualified immunity for essentially the same reasons as set out supra. Green cites no case law, and this court's research uncovered none, that places outside the realm of debate the question of whether a doctor, when seeing a patient who presents with a history abdominal pain and constipation and an occasional history of mildly elevated TSH levels, violates

---

[11]Dominguez testified that she was unable to provide a soy-free diet because it was not one of the approved therapeutic diets offered by the IDOC. However, Carter testified that he believed he could have ordered such a diet and Green notes that at least one inmate in the Harris lawsuit has been provided such a diet. Accordingly, a reasonable jury could conclude that Dominguez had the capability to prescribe such a diet but, as Green testified, simply refused.

[12]Green's expert testified similarly, but more broadly, that in his opinion all soy interferes with the absorption of Synthroid. However, for the same reasons supra, there is no indication that the more general opinion held by Green's expert has permeated medical treatment protocols to the point that no minimally competent doctor would fail to prescribe a soy-free diet for any patient on Synthroid.

the Constitution by ordering various other diagnostic tests and treatment before ordering a series TFTs and Synthroid, and continues to refuse to prescribe a soy-free diet. Mullenix, 577 U.S. at ___, 136 S. Ct. at 308 ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate." (quotation marks omitted)).

Based on the foregoing, there is insufficient evidence on the record for a reasonable jury to conclude that Dominguez was deliberately indifferent to Green's hypothyroidism, and none of Green's arguments to the contrary, individually or as a group, change that analysis. Even if there were, Dominguez is entitled to qualified immunity. Accordingly, the motion for summary judgment is granted as to Dominguez.

### III. CONCLUSION

Defendants' motion for summary judgment is granted. This case is closed.[13]

Date: 3/29/2016

ENTER:

_____
FREDERICK J. KAPALA

District Judge

---

[13]The court recognizes that Green's attorneys and his expert offered their services to Green without cost, the attorneys by way of recruitment by this court and the expert by way of volunteering. The court wishes to express its thanks for the hard work of all involved in presenting the best possible case for Green.